UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SASO GOLF, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08 C 1110 |
| | ) | |
| v. | ) | Judge Blanche M. Manning |
| | ) | |
| NIKE, INC. | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| Defendant. | ) | Jury Trial Demanded |
| | ) | |

**NIKE, INC.'S RESPONSE TO SASO GOLF'S MOTION SEEKING AN ORDER FOR UNRESTRICTED DISCLOSURE OF NIKE, INC.'S HIGHLY CONFIDENTIAL INFORMATION TO SASO GOLF'S EXPERT, MARK C. MYRHUM**

**I.      Introduction**

The Court entered a Protective Order ("PO") on September 11, 2008. Exhibit A; Dkt. Nos. 43-44. The PO provides that a party may object to the disclosure of highly confidential information to a prospective testifying or consulting expert witness. Exhibit A, PO at ¶ 7. In accordance with the PO, NIKE timely objected to the disclosure of three limited categories of NIKE's highly confidential information to Saso's proposed expert, Mark C. Myrhum. Exhibit B, Letter from Fink to Ryndak, Aug. 20, 2009.

In response to Saso's request for additional information about NIKE's objection, NIKE identified the specific documents that should not be disclosed to Mr. Myrhum. Exhibit C, Letter from Suri to Fink, Aug. 24, 2009; Exhibit D, Letter from Fink to Suri, Aug. 26, 2009. NIKE also invited a dialogue between the parties to resolve this issue, observing that the three categories of documents it identified do not appear necessary or relevant to Mr. Myrhum's work as an expert for Saso. Exhibit D, Letter from Fink to Suri, Aug. 26, 2009. Moreover, NIKE made clear that

1

its objection is narrow and that it does not intend to preclude Saso from engaging Mr. Myrhum, let alone to prevent Saso from showing Mr. Myrhum highly confidential information he might actually need to assist Saso in this case. *Id.*

Without any further communication, Saso filed its motion for unrestricted disclosure of NIKE's highly confidential information to Mr. Myrhum on August 28, 2009. *See* Dkt. No. 84. The Court should reject Saso's motion and prevent Saso from disclosing three specific categories of NIKE highly confidential information to Mr. Myrhum for three reasons.

First, Mr. Myrhum consults for direct competitors of NIKE and disclosure of three specific types of NIKE's highly confidential documents to Mr. Myrhum puts NIKE at genuine risk of commercial harm. Second, the three categories of documents NIKE objects to showing Mr. Myrhum are not necessary to his work in this case.

Finally, in balancing the interests of the parties, NIKE faces a genuine risk of commercial harm from unfettered disclosure of information to Mr. Myrhum, whereas Saso faces little if any burden. Thus, the interests tip heavily in NIKE's favor and the Court should reject Saso's motion. Accordingly, the Court should issue an order limiting the information that can be provided to Mr. Myrhum.

## II.     Argument

### A. The Applicable Standard – Balancing the Interests of the Parties – Strongly Favors Limited Restrictions on Mr. Myrhum's Access to Highly Confidential Information

Because the Court has already issued a protective order in this case it must balance the interests of the parties to determine the extent of access Mr. Myrhum should have to NIKE's highly confidential information. *BASF Corp. v. U.S.*, 321 F. Supp.2d 1373, 1378 (C.I.T. 2004) (citing to *Telular Corp. v Vox2, Inc.*, 2001 WL 641188 *1 (N.D. Ill. 2001)); *See U.S. Gypsum*

*Co. v Lafarge N. Am. Inc.*, 2004 WL 816770 at *1 (N.D. Ill.) (Hart, J). In this instance, NIKE's substantial interests in protecting the confidentiality of its (1) native electronic engineering files, (2) sales data, and (3) manufacturing communications far outweigh Saso's questionable – and unsubstantiated – interest in disclosing these categories of highly confidential information to Mr. Myrhum.

Saso's motion confuses and mischaracterizes the issues in at least three ways. First, there is no serious dispute that Mr. Myrhum works in a competitive capacity to NIKE and that unintended, inadvertent disclosure of highly confidential information is a real concern – especially because it can be avoided now but not remedied later. Second, contrary to Saso's suggestion, NIKE limited its objection to highly confidential information that is not necessary or relevant to Mr. Myrhum's work in this case. Finally, Saso has not even attempted to show any need for Mr. Myrhum specifically to access the three categories of information identified by NIKE. Each issue is addressed in turn below.

**B. Because he is a Professional Consultant to the Golf Industry, Mr. Myrhum's Access to Highly Confidential Information Should be Tailored to Minimize the Risks of Inadvertent Disclosure in the Future**

Mr. Myrhum is a consultant to the golf industry and, specifically, has consulting roles relating to manufacturing processes for golf clubs. Mr. Myrhum includes in his CV a list of consulting services he provides to Original Equipment Manufacturers, including "manufacturing in China, Japan, Taiwan, Korea." Exhibit E, CV of Mark C. Myrhum.

A further search of public records reveals that Mr. Myrhum has worked for, consulted for, or presently consults with at least the following golf companies: Carbite Golf, Dynacraft Golf International (which is now merged with Hireko Golf[1]), Element 21 Golf Company, Master

---

[1] Mr. Myrhum, through his consultancy company MCM Golf Inc., is credited with designing Dynacraft brand "Launch Series" Clubs. Exhibit G, Excerpt of USGA Conforming Clubs, Sep. 14, 2009. Dynacraft

3

Grip Golf, McHenry Metals Golf Inc., Tour Edge Golf, and Wilson Golf. Ex. I, PrimeZone Media Network News Report, Jun. 12, 2006. In correspondence with Saso, NIKE identified a number of these companies and Saso has not disputed that Mr. Myrhum was or is associated with these entities. Exhibit D; *see* Dkt. No. 84. Several of these companies, namely at least Dynacraft/Hireko, Element 21 Golf Company, Tour Edge Golf, and Wilson Golf, are competitors to NIKE in the fields of golf club design and/or manufacture. Exhibit J, Spencer Decl. ¶¶ 7-8.

Mr. Myrhum's consulting relationship with Element 21 in particular illustrates that he designs golf clubs in direct competition to NIKE's golf clubs, including clubs at issue in this case. *Id.* For example, Mr. Myrhum is credited with roles in the design and manufacture of Element 21's clubs including its "Emc(2)" driver. Exhibit K, Dow Jones Factiva News Report, Jan 29, 2007. In addition, Mr. Myrhum is reported to provide manufacturing expertise to Element 21 Golf Company ("Element 21"). Exhibit F, PR NewsWire Report, Apr. 19, 2007.

In its advertising, Element 21 pitches its "Emc(2) driver" directly against NIKE's "SUMO" brand of clubs. Exhibit L, Emc(2) Advertisement, p 2, available at www.e21sports.com/golf/store/ (under Emc2 Drivers, Download Product Sheet). A number of NIKE's "SUMO" brand of clubs are the subject of Saso's infringement allegations in this case. Thus, Mr. Myrhum's consulting role at least with Element 21 puts him in a position that even the company he consults with boasts to be directly competitive with NIKE.

---

is part of Hireko Golf. Exhibit H, Hireko-Dynacraft Merger press release, available at http://www.freegolfinfo.com/forums/tm.aspx?m =1858519&mpage=1&key=&#1858519.
Notably, NIKE sued Hireko Golf in 2005 in civil action 05-cv-01734 in the District of Oregon for infringement of a number of NIKE's design patents relating to NIKE golf clubs. The dispute was resolved in 2007.

4

Of particular concern to NIKE is that Mr. Myrhum, if he obtains unfettered access to all NIKE highly confidential information, will be unable to compartmentalize and repress his knowledge of that information when he consults for NIKE's competitors. NIKE does not seek to cast doubt on Mr. Myrhum's integrity or impugn him in any way, but even with the best of intentions it is too much to expect an expert to unlearn or suppress what he or she has divined from access to another party's highly confidential information. *BASF Corp. v. U.S.*, 321 F. Supp.2d 1373, 1380 (C.I.T. 2004).

Further, Saso's unsupported assertion that the PO in this case protects NIKE from inadvertent disclosure lacks credibility, *see* Dkt. No. 84 at p. 4, because courts have expressly acknowledged that a protective order does not protect a party from inadvertent disclosure. *See e.g., BASF Corp.*, 321 F. Supp.2d at 1380-81; *U.S. Gypsum Co*, 2004 WL 816770 at *1; *Litton Industries, Inc. v. Chesapeake & Ohio Ry. Co*. 129 F.R.D. 528, 531 (E.D. Wis. 1990) (court stating "[t]he expert's raison d'etre is to assimilate information in his or her chosen field and formulate that material into various theories. The information obtained from Bay will be added to the expert's repository of other information for possible future use. Even with stern sanctions for unauthorized disclosure, how does one practically police a protective order? If the expert is called upon two years after this litigation to assist a potential competitor in structuring its business, will he really be able to compartmentalize all he or she has learned and not use any of the information obtained from Bay?").

Moreover in this case, Saso and NIKE expressly agreed that experts and other consultants are prohibited from being employed by the party receiving confidential information under the PO for two years after the lawsuit ends. Exhibit A, PO at ¶ 7. Thus, as further discussed in Section E below, Saso's agreement to restrict experts' freedom to consult after the case ends admits that

5

there is a real risk of inadvertent disclosure by the parties' respective experts. Indeed, the risk of inadvertent disclosure is one of the reasons why this Court applies a balancing test to determine what level of access an expert should have to highly confidential information. *See U.S. Gypsum Co.*, 2004 WL 816770 at *1.

Because Mr. Myrhum consults in capacities directly competitive to NIKE, and because there is a real, judicially recognized risk of inadvertent disclosure, NIKE sought Saso's agreement not to disclose certain highly confidential information to Mr. Myrhum. NIKE has never taken the position that Mr. Myrhum must have no involvement with this case, although courts have wholly excluded experts on similar facts. *See BASF Corp.*, 321 F. Supp.2d at 1380-81; *Rice v U.S.*, 39 Fed. Cl. 747, 752 (Fed. Cl. 1997). Instead, NIKE has proposed that withholding three categories of NIKE's highly confidential information from Mr. Myrhum will protect NIKE from unfair commercial advantage while respecting Saso's desire to use the expert of its choice.

### C. Mr. Myrhum Should not Access, and Does not Need, Three Types of Highly Confidential Information in this Case

NIKE has identified three types of information that, if disclosed to Mr. Myrhum, present a genuine risk that NIKE's competitors will receive an unfair competitive advantage. These categories are (1) native .IGS computer files; (2) NIKE's non-public sales and cost data; and (3) communications between NIKE and its vendors and manufacturers. Exhibit D, Letter from Fink to Suri, Aug. 26, 2009.

Importantly, Mr. Myrhum does not need this information to assist Saso in this case. Here, presumably, Mr. Myrhum will assist Saso with technical matters relating to claim construction, infringement, and invalidity, and these activities are the context in which the Court should consider NIKE's proposed limitations on disclosure of its highly confidential information.

6

*See U.S. Gypsum Co*, 2004 WL 816770 at *3 (Judge Hart observing that certain confidential information may not be relevant to the method patent at issue). Tellingly, Saso has never explained, in correspondence to NIKE or in its motion to the Court, why Mr. Myrhum would need the three types of documents identified by NIKE for his work on these issues.

As demonstrated in turn below, Saso cannot show that Mr. Myrhum needs the information subject to NIKE's objection.

### 1. Mr. Myrhum Does not Need NIKE's Native .IGS Electronic Files

NIKE manufactures its golf clubs from Computer Aided Design (CAD) files. Exhibit M, Wahlin Decl. ¶ 3. CAD files are compiled on a computer by a draftsperson and can be assembled in many different forms. In essence, they are a digital blue print of a club head and disclose dimensions, tolerances, component assemblies, material thicknesses, and additional information necessary to build a modern golf club head. *Id*.

".IGS" files are a type of CAD file reflecting the surfaces of the club head in three dimensional space. *Id*. at ¶ 4. At Saso's request, NIKE produced .IGS files to Saso in their native, electronic form. Indeed, NIKE produced fifty-two of its native .IGS computer files[2] to Saso, which includes, where such .IGS files exist, one for each metal wood driver NIKE has ever made, including files for each of the clubs Saso now accuses of infringement in this case.

Because NIKE's .IGS computer files contain native information about surface features in the construction of the club head, and because NIKE produced a collection of 52 such native computer files, the .IGS files might be described as an easily accessible and 'distilled track record' of NIKE's club construction process over the years. Thus, these files are distinguishable from NIKE's other highly confidential information which NIKE agrees may be made available to Mr. Myrhum, such as inventor's concept sketches, printed CAD drawings, and images of clay

---

[2] This includes *.igs files, as well as additional, related files necessary to run the *.igs files.

7

models, because NIKE's native .IGS files embody how NIKE has designed clubs for manufacture over the past six to seven years and not simply the resultant club heads, sketches, prints, or images. *See id.* at ¶¶ 4-5.

This is commercially valuable information because NIKE's .IGS files show to a golf club designer like Mr. Myrhum the manner in which NIKE has used iterative computer design processes to optimize the construction of its golf clubs. This information is particularly sensitive because a competitor having access to NIKE's native .IGS files would be able to optimize or improve their own design process based on NIKE's experiences. *See id.* at ¶¶ 5-6.

Importantly, Mr. Myrhum does not need access to NIKE's native .IGS computer files. First, they do not contain information relevant to claim construction. This is because the "meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The electronic data in NIKE's .IGS files relates to NIKE's golf clubs from approximately 2002 onward, and is therefore entirely irrelevant to the meaning – if any – of claim terms Saso used in its asserted patent in 1991.

Second, even if Saso's patent survives claim construction and the Court determines it can ascribe some definite meaning to the asserted claim, a non-infringement analysis requires comparing the properly construed claims against the accused products, which in this case are NIKE's physical club heads, not NIKE's native .IGS files. Furthermore, there can be no dispute that NIKE's native .IGS computer files are not prior art to the asserted patents and have no bearing on NIKE's invalidity arguments of anticipation and obviousness.

Finally, even if Saso argues they contain relevant information, Mr. Myrhum does not need access to NIKE's native .IGS files because: (A) NIKE also produced printed CAD drawings of all the clubs for which it produced .IGS files and (B) Saso previously enlisted the assistance of a computer aided designer, Mr. Matthew Kenner, who – NIKE understands – has had the opportunity to review and take measurements from NIKE's native .IGS files. Exhibit N, CV and PO undertaking of Mr. Matthew T. Kenner.

Notably, Mr. Kenner had no connections to the golf industry, and thus did not raise the same concerns as Mr. Myrhum. Thus, if Saso believes Mr. Myrhum needs information contained within NIKE's native .IGS files, he can access it from print outs produced by NIKE or from the measurements taken by Mr. Kenner. However, in no case does Mr. Myrhum directly need to access NIKE's native .IGS computer files.

### 2. Mr. Myrhum Does not Need NIKE's Communications with its Vendors and Manufacturers

NIKE also seeks to limit Mr. Myrhum's access to communications between NIKE's design and manufacturing staff and NIKE's vendors and its manufacturers in Asia. These communications include detailed information about NIKE's optimization of golf club manufacturing processes, including how to solve particular manufacturing problems, cost saving techniques, and methods of managing manufacturing quality controls. Exhibit M, Whalin Decl. ¶ 7. Accordingly, this is commercially sensitive information, *id.* at ¶ 8, and it would be harmful to NIKE if these communications were disclosed to a consultant such as Mr. Myrhum who directly consults with golf club designers on manufacturing in Asia.

In fact, NIKE has learned[3] that Mr. Myrhum has consulted and may currently be consulting for Element 21 to oversee its manufacturing issues. Exhibit F, PR NewsWire Report,

---

[3] At NIKE's prompting, Saso has recently provided NIKE with limited information regarding Mr.

Apr. 19, 2007. Related to Mr. Myrhum's consultation is the fact that Element 21 contracted with a facility that also purportedly manufactures clubs for NIKE. *Id*. Thus, Mr. Myrhum's access to NIKE's communications with its vendors and manufacturers would give Mr. Myrhum's clients – NIKE's competitors – a commercial advantage when negotiating and communicating with the very same vendors and manufacturers, all to NIKE's detriment.

Moreover, for many of the reasons listed above, Mr. Myrhum does not need access to NIKE's communications with its vendors and manufacturers. Manufacturing communications are irrelevant to the issues of claim construction, non-infringement, and invalidity, and it is unclear to NIKE why Mr. Myrhum would ever require access to these communications in this case.

Thus, disclosure of NIKE's vendor communications to Mr. Myrhum would competitively disadvantage NIKE and in any event is unnecessary because these communications are irrelevant to the technical issues in this case.

### 3. Mr. Myrhum Does not Need NIKE's Sales Data

Finally, NIKE objects to the disclosure of NIKE's detailed sales information to Mr. Myrhum. The sales data NIKE has produced to Saso is not publicly known. Exhibit J, Spencer Decl. ¶¶ 10-11. In this regard, Saso's failure to address why Mr. Myrhum needs to have access to this information is particularly telling. Indeed, there is no reason for a technical expert to have access to this kind of financial information. *U.S. Gypsum Co.*, 2004 WL 816770 at *3 (Judge Hart noting that financial information "is not the type of information that need be provided to a technical expert"). Moreover, even if Mr. Myrhum were not a competitor to NIKE (which he plainly is), an order restricting his access to this type of information is appropriate because

---

Myrhum's present consulting activities. The limited (highly confidential) information provided by Saso merely confirms what is generally, publicly known about Mr. Myrhum *i.e.* Mr. Myrhum consults with competitors of NIKE, like those identified in this response brief.

disclosure risks competitive harm to NIKE. Exhibit J, Spencer Decl. ¶ 11; *see Telular Corp. v Vox2, Inc.*, 2001 WL 641188 *4 (N.D. Ill. 2001).

### D. Saso Cannot Show a Need for Mr. Myrhum Specifically to have Unfettered Access to All NIKE Highly Confidential Information that Outweighs the Risk of Harm to NIKE

Saso has to date failed to address the specific limitations on disclosure proposed by NIKE, and instead has asserted, erroneously, that NIKE's objections to Mr. Myrhum would apply to every consultant in the field. Dkt. No. 84 at p. 5. This raises two issues.

First, the burden is on Saso to show why it is that Mr. Myrhum specifically requires unfettered access to all of NIKE's highly confidential information, *i.e.* Saso must show that there are not other experts available or that those who are available will be less useful than Mr. Myrhum. *U.S. Gypsum Co.*, 2004 WL 816770 at *1. Moreover, the Court may properly reject Saso's conclusory assertion that any independent expert with technical proficiency commensurate with Mr. Myrhum will inevitably raise the same confidentiality concerns. *See Rice v U.S.*, 39 Fed. Cl. at 751-52 (plaintiff expert excluded from access to confidential information because he was an active consultant in the field and plaintiff failed to bring evidence of what it had done to seek independent experts).

The second and related issue is Saso's assertion that knowledge of the "golf industry" makes for a suitable expert. Dkt. No. 84 at p. 5. This statement is misleading because the golf club technology at issue dates back nearly 20 years, given that the patents were filed in the early 1990's. Thus, Saso's expert(s) need not have current knowledge of the "golf industry" because the state of technology at the present time is not relevant to the issues in this case. Put another way, Saso has always been at liberty to engage experts that are not actively consulting or seeking to consult for NIKE's direct competitors. Moreover, NIKE expects that Saso has been able to identify other suitable individuals, either no longer actively consulting, retired from the industry,

or in academia, each having expertise relevant to the issues in the case and that could serve as experts equal to Mr. Myrhum.

Tellingly, Saso's engagement of Mr. Kenner and his ability to provide Mr. Myrhum with additional information – if any is required – illustrates how it is possible to address NIKE's valid concerns by compartmentalizing which individuals have access to particular categories of documents.

Thus, the balance of the parties' interests weighs in NIKE's favor because if Mr. Myrhum receives unfettered access to NIKE's highly confidential information, the risk of unfair commercial advantage inuring to NIKE's competitors is high whereas any burden on Saso created by NIKE's proposed restriction is demonstrably low or nonexistent.

### E. Saso's Reliance On This Court's Decision Relating to a Bar on Future Patent Prosecution is Misplaced

Saso's arguments are predicated on its unfounded view that NIKE's objection (in this present matter and that relating to a prior dispute regarding future patent prosecution) is intended to preclude Saso from obtaining a suitable expert in this case and to unnecessarily drive up Saso's costs. Exhibit C, Letter from Suri to Fink, Aug. 24, 2009. Saso is wrong on both counts..

First, the prior dispute related to the wording of the PO and whether it should restrict litigation counsel from acting as patent prosecution counsel for a period of time after the litigation ends ("prosecution bar" clause). In contrast, in this instance, Saso agreed to the wording in the PO as it relates to experts and consultants.

Specifically, the agreed PO language provides that prior to the disclosure of any information designated as highly confidential to a testifying or consulting expert not currently employed by a party, the receiving party shall give the producing party ten (10) days notice prior to the disclosure. Exhibit A, PO at ¶ 7. Moreover, the receiving party must provide the

disclosing party with a copy of the proposed expert's CV and complete a form describing the expert's work. *Id.* By agreeing to this language, Saso anticipated and admits that there might be instances where each party could have legitimate objections to the disclosure of highly confidential information to an expert that was not employed by either of the parties.

Second, Saso's reliance on the Court's earlier decision relating to the prosecution bar clause is misplaced for the additional and obvious reason that this dispute relates to experts, not patent prosecution counsel, and is governed by an entirely different set of facts. Tellingly, Saso contradicts its earlier arguments; while Saso's brief in the earlier prosecution bar dispute urged this Court to engage in a case-by-case analysis, *see* Dkt. No. 27, p. 4, Saso now urges the Court to ignore a case-by-case analysis and asserts that NIKE's purported "second use of [an] objection" means it must be unfounded and baseless. *See* Dkt. No. 84, p. 5. The facts here do not support Saso's position.

Among other things, there are important differences between exclusions of patent counsel and experts. *See Mercexchange, L.L.C. v. eBay, Inc.*, 467 F. Supp. 2d 608, 623, FN 21 (E.D.Va. 2006) (court comparing cases denying patent prosecution bar and allowing exclusion of experts observing that "not only must a court presume a heightened level of ethical conduct on the part of lawyers as compared to experts, but also, requiring a party to replace counsel they have a longstanding relationship with creates a much greater burden than requiring a party to hire different experts.")

In addition, and as noted above, Saso must come forward with evidence of the burden that NIKE's proposed restrictions will place upon it and its choice of expert. In this instance, NIKE has demonstrated that Mr. Myrhum consults for direct competitors of NIKE and that disclosure of three specific types of NIKE's highly confidential information to Mr. Myrhum puts

NIKE at genuine risk of commercial harm. NIKE has also demonstrated that the three types of information it identifies are not necessary to Mr. Myrhum's work, and that Saso's other expert, Mr. Kenner, can provide Mr. Myrhum with any club measurement data that could reasonably be required from NIKE's native .IGS computer files. In contrast, Saso has done nothing to show that it would be burdened by NIKE's proposed restrictions. Indeed, it cannot, because the facts here establish that the restrictions NIKE proposes are measured and appropriate.

### III. CONCLUSION

For the foregoing reasons, NIKE respectfully requests that this Court deny Saso's motion and instead grant an Order (proposed order attached as Exhibit N) restricting the disclosure of specified categories of NIKE's highly confidential information to Mr. Myrhum.

Respectfully submitted,

Dated: September 16, 2009

By: /s/ Erik S. Maurer
Christopher J. Renk (06199012)
   crenk@bannerwitcoff.com
Erik S. Maurer (06275467)
   emaurer@bannerwitcoff.com
Katherine L. Fink (06292806)
   kfink@bannerwitcoff.com
BANNER & WITCOFF, LTD.
10 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 463-5000
Facsimile: (312) 463-5001

Attorneys for Defendant,
NIKE, Inc.

14

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 16th day of September, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James D. Ryndak
Mark K. Suri
Eric H. Weimers
RYNDAK & SURI LLP
200 West Madison Street, Suite 2100
Chicago, Illinois 60606
*ryndak@ryndaksuri.com*
*suri@ryndaksuri.com*
*weimers@ryndaksuri.com*

                                                /s/ Erik S. Maurer