**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SASO GOLF, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 08 C 1110 |
| | ) |
| NIKE, INC., | ) Judge Blanche M. Manning |
| | ) Magistrate Judge Nan R. Nolan |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Saso Golf, Inc. has filed suit against Defendant Nike, Inc. alleging that its golf clubs infringe one of Saso Golf's patents in violation of 35 U.S.C. § 271. The case has been referred to this court for discovery supervision. Currently before the court is Saso Golf's motion to permit disclosure of Nike's highly confidential information to Saso Golf's expert. For the reasons set forth here, the motion is granted in part and denied in part.

## BACKGROUND

The court entered a Protective Order ("PO") in this case on September 11, 2008. (Minute Order of 9/11/08, Doc. 43.) Under the PO, both parties have agreed to limit disclosure of "Confidential" and "Highly Confidential" information, defined as trade secrets and other sensitive information "the disclosure of which to certain persons would, in the good faith judgment of the producing party, impair its commercial value or competitive worth, or otherwise be commercially injurious." (PO, Doc. 44, ¶ 2.) A party may disclose Highly Confidential information to a testifying or consulting expert who is "not currently employed by a party" as long as the opposing party receives notice and an opportunity to object. (*Id.* ¶ 7(c).)

On August 6, 2009, Saso Golf notified Nike that it had retained Mark C. Myrhum as an expert in this case, and that it intended to show him Nike's Highly Confidential information. Mr. Myrhum is President and Owner of MCM Golf, Inc., a golf industry consulting firm in Hartland, Wisconsin. (Pl. Mot., Ex. B.) In his Curriculum Vitae, Mr. Myrhum states that he provides

consulting services to golf original equipment manufacturers on a variety of topics, including manufacturing in China, Japan, Taiwan, and Korea. (*Id.*) Based on this information, Nike conducted a public records search and discovered that Mr. Myrhum "has worked for, consulted for, or presently consults with" direct competitors of Nike. (Def. Resp., at 3.) According to Nike, these include Dynacraft Golf International (now merged with Hireko Golf), Element 21 Golf Company, Tour Edge Golf and Wilson Golf. (*Id.* at 3-4.)

As an example of the direct competition, Nike points out that Mr. Myrhum is credited with designing Element 21's "Emc(2)" driver, and that he provides manufacturing expertise to the company. (Exs. F, K to Def. Resp.) Notably, Element 21 pitches its Emc(2) driver against Nike's SUMO brand of clubs in advertising materials. (Ex. L to Def. Resp.) Saso Golf, in turn, alleges here that a number of the SUMO brand of clubs infringe its patent.

Armed with this information, Nike has objected to Saso Golf showing Mr. Myrhum three categories of its Highly Confidential information: (1) native electronic engineering files; (2) sales data; and (3) manufacturing communications. Nike argues that disclosing these materials to Mr. Myrhum would be commercially injurious to the company due to the substantial likelihood of an unintended, inadvertent disclosure. Saso Golf disagrees and insists that Nike's limitations will essentially preclude Saso Golf from utilizing the expert of its choice.

## DISCUSSION

When, as here, the parties have executed a protective order governing disclosure of confidential information, the court must balance the interests of the party seeking disclosure against those of the party seeking protection. *Telular Corp. v. Vox2, Inc.*, No. 00 C 6144, 2001 WL 641188, at *1 (N.D. Ill. June 4, 2001). Specifically, "the court will balance [Saso Golf]'s interest in selecting the consultant most beneficial to its case, considering the specific expertise of this consultant and whether other consultants possess similar expertise, against [Nike]'s interest in protecting confidential commercial information from disclosure to competitors." *BASF Corp. v. United States*,

2

321 F. Supp. 2d 1373, 1378 (C.I.T. 2004) (citing *Telular*, 2001 WL 641188, at *1). Saso Golf bears the burden of showing that "there are not other experts available or that those who are available will be less useful than [Mr. Myrhum]." *United States Gypsum Co. v. LaFarge N. Amer., Inc.*, No. 03 C 6027, 2004 WL 816770, at *1 (N.D. Ill. Mar. 2, 2004) (citing *Telular*, 2001 WL 641188, at *3). Nike, in turn, bears the burden of showing that the confidential information will be "useful to [Nike]'s competitors, and that [Mr. Myrhum] is in a position that could allow the information to be used by competitors." *Id.* (citing *Telular*, 2001 WL 641188, at *2).

### A. Competition

Nike does not object to Saso Golf retaining Mr. Myrhum as an expert in this case. Rather, Nike argues that Mr. Myrhum should not be allowed to see three highly confidential categories of information. This circumscribed approach is well-considered, as Nike has not made a particularly strong showing that Mr. Myrhum is a competitor sufficient to disqualify him from reviewing any confidential information in the case. Indeed, the parties discuss only Mr. Myrhum's work for Element 21, with Nike making much of the fact that he designed the Emc(2) driver, which competes directly with Nike's SUMO brand of clubs. (Def. Resp., at 4.) It appears, however, that Element 21 deals primarily in fishing rods and equipment, deriving only 5% of sales from its golf business. (Myrhum Aff., Ex. G to Pl. Reply, ¶ 7.) In addition, Element 21's golf clubs are made out of scandium, a material no other company – including Nike – utilizes. Nike's accused clubs, for example, are made out of titanium. (Pl. Reply, at 6; Myrhum Aff. ¶ 7.)

### B. Relevance and Risk of Disclosure

The court therefore turns to the particular confidential information at issue to determine whether it is properly disclosed to Mr. Myrhum. Nike seeks to withhold its (1) native .IGS computer files; (2) non-public sales and cost data; and (3) communications with vendors and manufacturers. Nike argues that Mr. Myrhum does not need to see any of this information in order to render an

3

opinion in this case, and that there is a high risk of inadvertent disclosure and harm to Nike if he does. The court considers each in turn.

### 1. .IGS Files

Nike manufactures its golf clubs from Computer Aided Design ("CAD") files. CAD files are compiled on a computer by a draftsperson, and are in essence "a digital blue print of a club head and disclose dimensions, tolerances, component assemblies, material thicknesses, and additional information necessary to build a modern golf club head." (Def. Resp., at 7.) ".IGS" files are a type of CAD file reflecting the surfaces of the club head in three dimensional space. Nike has produced some 52 native .IGS files to Saso Golf, representing nearly every metal wood driver Nike has ever made. According to Nike, the .IGS files are "an easily accessible and 'distilled track record' of Nike's club construction process over the years." (*Id.*) They are thus distinguishable from inventor's concept sketches, printed CAD drawings, and images of clay models, which Nike does not object to disclosing to Mr. Myrhum. (*Id.* at 7-8.)

Nike argues that Mr. Myrhum does not need access to the highly valuable and proprietary .IGS files for purposes of claim construction because they were all generated from 2002 onward, many years after Saso Golf patented its design in 1991. Saso Golf does not challenge this assertion, focusing instead on an infringement analysis. According to Saso Golf, Mr. Myrhum needs access to the .IGS files because they are more accurate than measuring the physical clubs. Saso Golf also speculates that though its computer aided designer, Matthew Kenner, personally reviewed the .IGS files, he may have made errors in taking measurements.

The court recognizes that most of the potential experts Saso Golf contacted were not only reluctant to take a position in opposition to Nike, but actually hoped to get work from the company. (Suri Aff., Ex. F to Pl. Reply, ¶¶ 2-5.) Nevertheless, the extreme sensitivity of the .IGS files raises heightened concerns of inadvertent disclosure to competitors that may not be protected adequately by the PO. Courts have recognized that "[i]t is very difficult for the human mind to compartmentalize

4

and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *BASF*, 321 F. Supp. 2d at 1380. *See also United States Gypsum*, 2004 WL 816770, at *1 ("Although a person may, in good faith, attempt to segregate knowledge learned in confidentiality during litigation, it would be difficult for a person . . . to segregate any knowledge gained in this case from future analyses provided in his role as a consultant.") As one court explained, "[t]he expert's raison d'etre is to assimilate information in his or her chosen field and formulate that material into various theories. The information obtained . . . will be added to the expert's repository of other information for possible future use. Even with stern sanctions for unauthorized disclosure, how does one practically police a protective order? If the expert is called upon two years after this litigation to assist a potential competitor in structuring its business, will he really be able to compartmentalize all he or she has learned and not use any of the information . . . ?" *Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wis. 1990).

Saso Golf suggests that these concerns do not apply here because the cited cases are distinguishable. In *BASF*, for example, the expert served as a "retained, part-time consultant" to a competitor. 321 F. Supp. 2d at 1379. In *Litton*, the plaintiff sought confidential information from a non-party. 129 F.R.D. at 530. And in *Rice v. United States*, 39 Fed. Cl. 747 (1997), the plaintiff himself sought to be included as a qualified person entitled to review confidential information. *Id*. at 751. Regardless, the court finds that the risk of inadvertent disclosure outweighs Saso Golf's need to show the .IGS files to Mr. Myrhum at this time. Mr. Myrhum acknowledges that he currently does consulting work for two Nike competitors, and he is likely to consult with other competitors in the future (as noted, he appears to be one of the few consultants willing to oppose Nike). The .IGS files show how Nike "has used iterative computer design processes to optimize the construction of its golf clubs," which would be particularly relevant to a designer such as Mr. Myrhum. (Def. Resp., at 8.) The court agrees with Nike's concern that Mr. Myrhum would have difficulty compartmentalizing this knowledge. Also weighing in favor of protection is the fact that Mr. Myrhum

will have access to the actual club heads, printed CAD drawings, and Mr. Kenner's measurements, taken directly from the .IGS files. Saso Golf's mere speculation that Mr. Kenner's analysis may prove inaccurate is not sufficient to establish that Mr. Myrhum needs personally to review native information about surface features in the construction of Nike's club heads.

### 2. Sales and Cost Data

Nike next objects to disclosing its non-public sales data to Mr. Myrhum. In Nike's view, "there is no reason for a technical expert to have access to this kind of financial information." (Def. Resp., at 10 (citing *United States Gypsum*, 2004 WL 816770, at *3) ("It would also seem that financial and customer information that may be disclosed because possibly relevant to the issue of damages is not the type of information that need be provided to a technical expert."). Unlike in *United States Gypsum*, however, Saso Golf claims that the sales data "is relevant to the validity issue of obviousness." (Pl. Reply, at 8.) Specifically, secondary consideration evidence, such as commercial success, "constitutes independent evidence of nonobviousness." *Rothman v. Target Corp.*, 556 F.3d 1310, 1321 (Fed. Cir. 2009) (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1356 (Fed. Cir. 2008)).

The court finds that the balance weighs in favor of disclosing the sales data to Mr. Myrhum. The information is relevant to an assessment of validity and, as noted, Saso Golf has demonstrated that "there are not other experts available or that those who are available will be less useful than [Mr. Myrhum]." *United States Gypsum*, 2004 WL 816770, at *1. Contrary to Nike's suggestion, there is no evidence that retired consultants and academics will be as effective as Mr. Myrhum, or that they will be more willing or able to oppose Nike. At the same time, Nike has not shown that any risk of inadvertent disclosure of the sales data cannot be addressed adequately by the PO. Unlike the .IGS files, there is no reason to believe that sales data is likely to be incorporated into an expert's design repertoire.

### 3. Communications

Nike finally seeks to limit Mr. Myrhum's access to communications between Nike's design and manufacturing staff and its vendors and manufacturers in Asia. Nike claims that the communications include "detailed information about Nike's optimization of golf club manufacturing processes, including how to solve particular manufacturing problems, cost saving techniques, and methods of managing manufacturing quality controls." (Def. Resp., at 9.) In Nike's view, this information is irrelevant to this case, and would give Nike's competitors a commercial advantage when negotiating and communicating with Nike's vendors and manufacturers. (*Id.* at 10.)

Saso Golf argues that the communications are relevant in that "there may be documents showing use of terms found in the asserted claim in a manner consistent with the way the `495 Patent uses those claim terms." (Pl. Reply, at 9.) Saso Golf also claims that "there may be information in those documents that sheds light on infringement issues and perhaps validity issues." (*Id.* at 9-10.)

The court finds both parties' arguments rather weak. Nike focuses on Element 21, which does not appear to be a significant competitor. At the same time, Saso Golf's claimed need for the communications is somewhat speculative and conclusory. On balance, the court concludes that Mr. Myrhum may have access to the information in question. As noted, Saso Golf has demonstrated that other experts are either unavailable or less useful than Mr. Myrhum and, as with the sales data, the harm to Nike is tempered by the PO.

### CONCLUSION

For the reasons stated above, Saso Golf's Motion to Permit Disclosure of Nike Highly Confidential Information to Saso Golf Designated Expert Mark C. Myrhum [84] is granted in part and denied in part.

ENTER:

Dated: October 5, 2009

_____
NAN R. NOLAN
United States Magistrate Judge